**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JEFFREY E. KOWITZ, individually and on behalf of all others similarly situated, | § | CIVIL ACTION NO. 3:26-cv-01235-X |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| v. | § | DEMAND FOR JURY TRIAL |
| ALAIR ENTERPRISES USA, INC.; ALAIR ENTERPRISES USA HOLDINGS, INC.; ROBERT F. CECIL; KATRINA McLAUCHLAN; DUANE JOHNS; STUART HOPEWELL; and BLAIR McDANIEL, | § | |
| Defendants. | § | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff Jeffrey E. Kowitz, individually and on behalf of all others similarly situated, files this First Amended Class Action Complaint against Defendants Alair Enterprises USA, Inc., Alair Enterprises USA Holdings, Inc., Robert F. Cecil, Blair McDaniel, Katrina McLauchlan, Duane Johns, and Stuart Hopewell, and would respectfully show the Court as follows:

## I. NATURE OF THE ACTION

1. Plaintiff Jeffrey E. Kowitz brings this action, on behalf of himself and a putative class of similarly situated homeowners, against the Alair Homes Enterprise for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968. Defendants designed, operated, and continue to operate a network-wide Scheme through which the Alair Homes brand, marketing architecture, and standardized contracting templates are used to induce homeowners into construction transactions under false pretenses, with corporate-level overcharges embedded in the transaction pricing through standardized franchise royalties, common fund assessments, advertising fund contributions, and vendor-rebate kickback arrangements.

2. The Enterprise operates through approximately 109 regional partner offices across 13 U.S. states, including Arizona, California, Florida, Georgia, Iowa, New York, North Carolina, Ohio, South Carolina, Texas, Utah, Virginia, and Washington, as well as the District of Columbia, and five Canadian provinces. The Enterprise has been in operation since 2007 and continues to operate as of the date of this Complaint.

3. Plaintiff seeks actual damages, treble damages, disgorgement of Scheme proceeds, injunctive relief, attorneys' fees, and costs under 18 U.S.C. § 1964(c), individually and on behalf of the Class defined below.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968.

5. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds $5,000,000, exclusive of interest and costs; it is a class action in which there are more than 100 Class Members; and the parties are minimally diverse.

6. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Texas; the Corporate Defendants are citizens of Arizona; and the Director and Officer Defendants are citizens of Georgia, North Carolina, and Canada.

7. This Court has personal jurisdiction over the Corporate Defendants, and the Corporate Defendants transact their affairs within this District within the meaning of 18 U.S.C. § 1965(a). The Corporate Defendants do business, advertise, and market in the State of Texas and Dallas County; administer Alair regional partner offices located in Texas and Dallas County as part of the Enterprise's network; operate the corporate-controlled alairhomes.com lead-generation

architecture through which they captured the contact information of Texas homeowners, including Plaintiff, and routed those Texas homeowners to the Enterprise's Dallas, Texas regional partner; and directed the Enterprise's standardized brand-promise marketing at Texas residents. The Corporate Defendants' own involvement in the Dallas transaction at issue is confirmed by the sworn Declaration of Defendant Stuart Hopewell, the Chief Compliance Officer of both Corporate Defendants, filed in this Court at ECF 7-2, in which Hopewell attested under penalty of perjury to his "personal involvement in all of Alair Enterprises and Alair Holdings' dealings related to JRH Design & Build, LLC"—the Enterprise's Dallas, Texas regional partner. A substantial part of the events giving rise to Plaintiff's claims occurred in Dallas County, Texas, and the Corporate Defendants have purposefully availed themselves of the privilege of conducting business in the forum and maintained systematic and continuous business contacts with the forum.

8. This Court has specific personal jurisdiction over each Director and Officer Defendant because each expressly aimed the conduct giving rise to Plaintiff's claims at the State of Texas, and the effects of that conduct were felt in Texas. Each Director and Officer Defendant designed, directed, controlled, or participated in the operation and management of the standardized Scheme through which the Enterprise induced Texas homeowners, including Plaintiff, into construction transactions; routed Texas homeowners, including Plaintiff, through the corporate-controlled lead-generation architecture to the Enterprise's Dallas, Texas regional partner; maintained and administered Alair regional partner offices in Texas and Dallas County; and directed the Enterprise's standardized brand-promise marketing at Texas residents. Plaintiff's injuries were suffered in Dallas County, Texas, and arise directly out of and relate to each Director and Officer Defendant's forum-directed conduct.

9. The Court additionally has personal jurisdiction over the Director and Officer Defendants pursuant to 18 U.S.C. § 1965(b). At least one Defendant—each of the Corporate Defendants—resides, is found, has an agent, or transacts its affairs within this District within the meaning of 18 U.S.C. § 1965(a), as alleged above. The ends of justice require that the Director and Officer Defendants be brought before this Court, because the Defendants reside in or are located in multiple jurisdictions—Texas, Arizona, Georgia, North Carolina, and Canada—and there is no single State in which all Defendants would be subject to personal jurisdiction, such that adjudication of the integrated Scheme in a single forum is necessary to avoid duplicative litigation and the risk of inconsistent results. Because 18 U.S.C. § 1965(b) authorizes nationwide service of process, the exercise of personal jurisdiction over each Director and Officer Defendant comports with the Due Process Clause of the Fifth Amendment, as each maintains continuous and systematic contacts with the United States as a whole, including through his or her direction, control, or participation in the operation and management of an enterprise that operates approximately 109 regional partner offices across 13 U.S. states.

10. Further, and as to Defendants McDaniel, McLauchlan, and Hopewell specifically, this Court has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2). Plaintiff's claims arise under federal law, namely the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968. Upon information and belief, McDaniel, McLauchlan, and Hopewell, each a citizen and resident of Canada, are not subject to the jurisdiction of the courts of general jurisdiction of any single State. The exercise of jurisdiction over each of them comports with the Due Process Clause of the Fifth Amendment because each maintains continuous and systematic contacts with the United States as a whole, including by directing, controlling, or participating in the operation and management of an enterprise that operates approximately 109

regional partner offices across 13 U.S. states, that markets to and contracts with United States homeowners through the corporate-controlled alairhomes.com website, and whose United States trademark portfolio and corporate structure are maintained through United States entities, as alleged herein.

11. Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Dallas County, Texas, including Plaintiff's exposure to Defendants' inducement architecture, Plaintiff's use of Defendants' lead-generation portal to submit a request for contact, Defendants' routing of Plaintiff to the Dallas regional partner, Plaintiff's in-person meetings with the Dallas regional partner, Plaintiff's pre-contract cost-estimate payments, and Plaintiff's execution of the V092019 contract on June 22, 2020 for renovation of the property located at 7435 Kenshire Lane, Dallas, Texas 75230.

## III. PARTIES

### *A. Plaintiff*

12. Plaintiff Jeffrey E. Kowitz is a citizen of the State of Texas. Plaintiff purchased the property located at 7435 Kenshire Lane, Dallas, Texas 75230 on or about May 25, 2018. In 2020, induced by Defendants' standardized inducement architecture, Plaintiff contracted with an Alair regional partner for a major renovation of the property.

### *B. The Corporate Defendants*

13. Defendant Alair Enterprises USA, Inc. ("Alair Enterprises") is an Arizona corporation. According to Alair Enterprises' 2025 Annual Report filed with the Arizona Corporation Commission, its known place of business is CT Corporation System, 3800 North Central Avenue, Suite 460, Phoenix, AZ 85012. Alair Enterprises operates the Alair Homes brand

and franchise system in the United States, administering the network of approximately 109 regional partner offices across 13 U.S. states and 5 Canadian provinces. Alair Enterprises is the operating company of the integrated corporate structure: as confirmed by its Articles of Incorporation filed with the Arizona Corporation Commission on July 23, 2013, its stated corporate purpose is "to manage franchise business operations." In that operating-company capacity, and upon information and belief, Alair Enterprises owns and controls the alairhomes.com website and its corporate-controlled lead-generation and lead-routing systems; designs, approves, and disseminates the Enterprise's standardized brand-promise marketing; generates and version-controls the V092019 cost-plus construction contract template; delivers the Enterprise's standardized training programs; and administers the operational affairs of the regional partner network. For citizenship purposes, Alair Enterprises is a citizen of Arizona. Alair Enterprises was served with process through its registered agent on April 24, 2026.

14. Defendant Alair Enterprises USA Holdings, Inc. ("Alair Holdings") is an Arizona corporation. According to Alair Holdings' 2025 Annual Report filed with the Arizona Corporation Commission, its known place of business is CT Corporation System, 3800 North Central Avenue, Suite 460, Phoenix, AZ 85012. Alair Holdings' 2025 Annual Report confirms that its sole shareholder is Alair Enterprises Ltd., a Canadian entity located at 96 Wallace Street, Nanaimo, British Columbia, V9R 0E2, Canada. Alair Holdings is the holding company of the integrated corporate structure. Upon information and belief, Alair Holdings holds the Enterprise's financial operations and assets and is the entity through which the corporate-level margins extracted from homeowner-funded construction transactions—including the franchise royalties, common fund assessments, and vendor-rebate retentions described below—are received, held, and channeled upward to its sole shareholder, the Canadian parent Alair Enterprises Ltd. Defendants Alair

Enterprises and Alair Holdings maintain an internal requirement to receive and maintain copies of construction contracts entered by Defendants' regional partners with homeowners, as confirmed by the May 8, 2026 Declaration of Defendant Stuart Hopewell filed in this Court at ECF 7-2. For citizenship purposes, Alair Holdings is a citizen of Arizona. Alair Holdings was served with process through its registered agent on April 24, 2026.

15. Defendants Alair Enterprises and Alair Holdings are referred to herein collectively as the "Corporate Defendants" and individually as a "Corporate Defendant."

16. The Corporate Defendants are part of an integrated corporate structure with Alair Enterprises Ltd., the Canadian parent entity headquartered at 96 Wallace Street, Nanaimo, British Columbia, V9R 0E2, Canada. The trademarks under which the Alair Homes brand operates, including ALAIR, ALAIR HOMES, CLIENT CONTROL, and LIVING BETTER STARTS HERE, are held by Alair Enterprises Canada Ltd. and are used in the United States under license, as reflected in the copyright and trademark attribution on the alairhomes.com website.

17. Although the alairhomes.com website attributes the Alair trademarks to Alair Enterprises Canada Ltd., United States Patent and Trademark Office records reflect that on February 23, 2018, Alair Enterprises Canada Ltd. assigned its entire United States trademark portfolio—nine marks constituting the whole of the Alair brand portfolio, including the ALAIR name itself, ALAIR HOMES, ALAIR COMMERCIAL, CLIENT CONTROL, and LIVING BETTER STARTS HERE—to BCM Holdings USA Inc., a personal holding entity located at 466 South River Road, Elora, Ontario, Canada, for stated consideration of CAN $2.00. The assignment was recorded with the United States Patent and Trademark Office on March 6, 2018 (Reel 006285, Frames 0395–0398). Upon information and belief, the same individual—McDaniel—signed the assignment on behalf of both Alair Enterprises Canada Ltd. as assignor and BCM Holdings USA

Inc. as assignee, confirming that a single person controlled both sides of the transaction. Upon information and belief, the conveyance of the Enterprise's most commercially valuable assets for nominal consideration was a fraudulent conveyance executed to place the Alair brand portfolio beyond the reach of homeowner claimants while routing ongoing licensing revenue directly to McDaniel personally, outside the Corporate Defendants' disclosed corporate structure. Every Alair regional partner that uses the ALAIR name or the ALAIR HOMES mark in homeowner transactions does so under a brand owned by a McDaniel-controlled entity, with the resulting licensing revenue flowing outside the Enterprise's disclosed corporate structure to McDaniel.

18. Public filings with the Arizona Corporation Commission further confirm that the Enterprise's operational nerve center has at all relevant times been Canadian and controlled by McDaniel. In December 2014, McDaniel filed statements of change on behalf of both Arizona entities—Alair Enterprises and Alair Holdings—designating the principal office address of each as 1930 Island Diesel Way, Nanaimo, British Columbia, Canada, care of McDaniel personally. From at least December 2014 forward, the stated principal offices of both Corporate Defendants were McDaniel's personal Canadian address, while the entities' Arizona presence was maintained only through a registered-agent address in Phoenix. The Corporate Defendants thus had no genuine operational presence in Arizona, and the corporate-level proceeds generated from American homeowners and regional partners were directed to a Canadian address controlled by McDaniel personally.

***C. The Director and Officer Defendants***

19. Defendant Blair McDaniel ("McDaniel") is the Founder and Chairman of the Alair Homes Enterprise. McDaniel resides in Nanaimo, British Columbia, Canada. From the founding of the Corporate Defendants on July 23, 2013 through the present, McDaniel has occupied senior

officer and director positions across the integrated corporate structure. As confirmed by Annual Reports filed with the Arizona Corporation Commission and signed by McDaniel under penalty of perjury, McDaniel has served simultaneously as President, Secretary, Treasurer, and Director of Alair Enterprises USA, Inc. and Alair Holdings during the foundational period of the Enterprise. McDaniel directed, controlled, and participated in the operation and management of the Alair Homes Enterprise by, among other actions: founding the Enterprise; designing the Enterprise's standardized franchise architecture, brand-promise marketing, and contracting templates; establishing the "built-in investor group" that funds Enterprise expansion; controlling the Enterprise's vendor-rebate kickback architecture; controlling affiliated entities including, upon information and belief, Concept Property Management; directing the use of Enterprise proceeds to fund property holdings under McDaniel's control; causing Alair Enterprises Canada Ltd. to assign the Enterprise's entire United States trademark portfolio, including the ALAIR name and the ALAIR HOMES mark, to BCM Holdings USA Inc.—a McDaniel-controlled personal holding entity—for stated consideration of CAN $2.00, recorded with the United States Patent and Trademark Office on March 6, 2018; and attending and participating in the Enterprise's annual conferences, at which the Enterprise's standardized operating procedures and Scheme architecture are disseminated to and reinforced among regional partners and corporate personnel, including, upon information and belief, the April 2025 conference held in San Diego, California. McDaniel is a citizen of Canada. McDaniel was served with process on May 25, 2026 in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

20. Defendant Robert F. Cecil ("Cecil") is the Chief Executive Officer of the Alair Homes Enterprise. Cecil resides in Savannah, Georgia. Cecil joined the Alair Homes Enterprise in 2013 and has held three successive C-suite positions in the Enterprise. As confirmed by Cecil's

publicly available professional records, including his LinkedIn profile: (a) from March 2014 through September 2020, Cecil served as Chief Development Officer of Alair Homes; (b) from September 2020 through September 2024, Cecil served as President of Alair Enterprises USA, Inc. and Alair Enterprises USA Holdings, Inc., as confirmed by Annual Reports of both entities filed with the Arizona Corporation Commission; and (c) from September 2024 through the date of this Complaint, Cecil has served as Chief Executive Officer of the Enterprise. Across the period of the conduct alleged in this Complaint, Cecil has held continuous senior-executive positions placing him at the operational center of the Scheme. In an October 2024 interview published by RENXHomes, Cecil acknowledged that the Enterprise is "only by legal definition a franchise system," while simultaneously describing the Enterprise's model as "pure custom" in which "every single project we do is a prototype of a home that's never been built before." Cecil further stated that "many of our partners join because they made it through a certain stage of their career where they're looking for an exit." Cecil directed, controlled, and participated in the operation and management of the Enterprise by, among other actions: as Chief Development Officer from March 2014 through September 2020, designing and overseeing the development and expansion of the Alair Homes franchise network during the period in which the standardized inducement architecture and the V092019 cost-plus construction contract template were created, version-controlled, and deployed across the regional partner network; as Chief Development Officer, designing and approving the standardized brand-promise marketing materials disseminated through the alairhomes.com website during the period from at least 2014 through 2020, including the brand-promise content viewed by Plaintiff Kowitz in Dallas County, Texas; as Chief Development Officer, personally overseeing the recruitment and onboarding of regional partners into the Enterprise during the network's expansion period, including the period in which JRH

Design & Build, LLC was operating as the Enterprise's Dallas regional partner; as President from September 2020 through September 2024, continuing to administer the standardized franchise architecture across the regional partner network and overseeing the Corporate Defendants' operations during the period of Plaintiff Kowitz's project execution and continuing through the post-execution receipt of franchise royalties, common fund assessments, and vendor-rebate proceeds from the Kowitz transaction; as President, establishing and enforcing the revenue requirements and operational standards for the regional partner offices; as President and Chief Executive Officer, approving and continuing the use of the V092019 contract template (or any successor template performing the same function) across the regional partner network in transactions with homeowners; as Chief Executive Officer from September 2024 through the date of this Complaint, serving as the public face of the Enterprise's marketing and recruitment messaging, including through the October 2024 RENXHomes interview; and attending and participating in the Enterprise's annual conferences, including, upon information and belief, the April 2025 conference held in San Diego, California. Cecil is a citizen of the State of Georgia. Cecil was served with process at his residence on May 19, 2026.

21. Defendant Katrina McLauchlan ("McLauchlan") is the Chief Financial Officer of the Alair Homes Enterprise. McLauchlan resides in Nanaimo, British Columbia, Canada. McLauchlan is, in addition to her CFO role, one of the founding members of the Enterprise, as confirmed by the independent testimony of former Alair regional partners. McLauchlan directed, controlled, and participated in the operation and management of the Enterprise by, among other actions: as Chief Financial Officer, designing and administering the financial architecture through which the Enterprise extracts margins from homeowner-funded construction transactions, including the franchise royalty rate of approximately 4% of regional partner gross revenues,

advertising fund contributions, and the 5% gross revenue assessment contributed to the common fund; controlling and administering the common fund into which regional partners contribute pursuant to the Enterprise's franchise license terms; overseeing the distribution of Enterprise proceeds, including the upward flow of U.S.-generated proceeds to affiliated Canadian entities controlled by the Director and Officer Defendants; as a founding member of the Enterprise, participating in the design of the Enterprise's foundational financial architecture from its earliest period of operation; and attending and participating in the Enterprise's annual conferences, including, upon information and belief, the April 2025 conference held in San Diego, California. McLauchlan is a citizen of Canada. McLauchlan was served with process on May 26, 2026 in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

22. Defendant Duane Johns ("Johns") is the Chief Operating Officer of the Alair Homes Enterprise. Johns resides in Mooresville, North Carolina. Prior to becoming Chief Operating Officer, Johns was operationally embedded in the regional partner network: he initially operated as a partner within an Alair regional office, was promoted to regional partner status, and ultimately rose to become the most senior operational executive of the Enterprise in the United States, as confirmed by the independent testimony of former Alair regional partners. Johns directed, controlled, and participated in the operation and management of the Enterprise by, among other actions: as Chief Operating Officer, overseeing the day-to-day operational management of the Enterprise across its regional partner offices; supervising the standardized training programs delivered by the Enterprise to regional partners, including training on the use of the V092019 contract template, the marketing-claim architecture, and the standardized operating procedures used in homeowner transactions; coordinating operational directives across the regional partner

network through written communications, conference calls, and in-person meetings; having previously operated as a partner and regional partner within the Enterprise prior to ascending to Chief Operating Officer, possessing direct personal familiarity with the Scheme's operational implementation at the regional partner level; and attending and participating in the Enterprise's annual conferences, including, upon information and belief, the April 2025 conference held in San Diego, California. Johns is a citizen of the State of North Carolina. Johns may be served with process at his residence located at 260 Wood Duck Loop, Mooresville, NC 28117, or wherever he may be found.

23. Defendant Stuart Hopewell ("Hopewell") is the Chief Compliance Officer of the Alair Homes Enterprise. Hopewell resides in Nanaimo, British Columbia, Canada. Hopewell directed, controlled, and participated in the operation and management of the Enterprise by, among other actions: as Chief Compliance Officer, overseeing the Enterprise's compliance with internal policies, including the internal requirement that the Corporate Defendants receive and maintain copies of construction contracts entered by the Enterprise's regional partners with homeowners; overseeing litigation for the Corporate Defendants; serving as the Enterprise's point of contact for franchisee and homeowner complaints; implementing the policy of routing homeowner disputes into private arbitration through the mandatory-arbitration provision deployed in every Alair homeowner contract; overseeing the use of search-engine-optimization suppression services to remove negative online reviews of the Enterprise from public search results; making verbal promises to regional partners followed by contradictory written legal notices, as documented by the independent testimony of former Alair regional partners; and attending and participating in the Enterprise's annual conferences, including, upon information and belief, the April 2025 conference held in San Diego, California. In the May 8, 2026 Declaration filed in this Court at

ECF 7-2, Hopewell testified under penalty of perjury that he has "personal involvement in all of Alair Enterprises and Alair Holdings' dealings related to JRH Design & Build, LLC." That sworn representation is irreconcilable with the position the Corporate Defendants took in February 2024 in opposing Plaintiff's Rule 202 Petition, when Defendants represented to the 192nd Judicial District Court of Dallas County, Texas that Defendants "have nothing to do with the Project." Hopewell is a citizen of Canada. Hopewell was served with process on May 27, 2026 in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

24. As specific examples of Hopewell's conduct with respect to Alair franchisees, upon information and belief: (a) Hopewell and Defendant McDaniel verbally promised a Canadian franchisee that Alair would fund the construction of a show home in Kelowna, British Columbia as an inducement for the franchisee to uproot his family, relocate to Kelowna, and take over an existing Alair franchise; after the franchisee relocated his family and generated over $3.5 million in active construction as Alair directed, Hopewell and McDaniel withdrew the promise without justification or compensation, and Hopewell subsequently issued a written legal directive instructing the franchisee not to continue operating in his field; and (b) Hopewell induced another Canadian franchisee to invest substantial time and resources developing a detailed financial pro forma for a rental property project in the franchisee's designated territory, leading the franchisee to reasonably believe that Alair would facilitate the project, only for Hopewell to redirect the opportunity to a project in Hopewell's own region without compensation or explanation.

25. Defendants Cecil, McDaniel, McLauchlan, Johns, and Hopewell are referred to herein collectively as the "Director and Officer Defendants" and individually as a "Director and Officer Defendant."

# IV. THE ALAIR HOMES ENTERPRISE

## *A. Enterprise Definition and Architecture*

26. At all relevant times, Defendants Alair Enterprises USA, Inc., Alair Enterprises USA Holdings, Inc., the Director and Officer Defendants, the approximately 109 regional partner offices operating under the Alair Homes brand, the vendor co-conspirators with whom the Enterprise maintains master rebate agreements (including, without limitation, Rona, Sherwin-Williams, Emser Tile, LP Building Solutions, Koala Insulation, Aroom, and Glacier Stone Supply), the network of accounting, training, software, and event-planning services through which the Enterprise extracts fees from regional partners, and the "built-in investor group" identified by Defendant Cecil constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), engaged in and affecting interstate commerce.

27. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants and their co-conspirators engage. The Enterprise has a continuing organizational form, with formal leadership in the Corporate Defendants and the Director and Officer Defendants; standardized operating procedures applicable to every regional partner office; a standardized brand and marketing architecture; standardized contracting templates including the V092019 cost-plus construction contract template generated and version-controlled at Alair corporate offices; standardized training programs delivered to regional partners; standardized operational and reporting systems including the proprietary Client Control™ platform; standardized financial architecture including franchise royalty rates, common fund assessments, and vendor-rebate retention rates; and an annual conference, including the April 2025 conference held at Paradise Point Resort & Spa in San Diego, California, that brings together senior management, regional partners, and corporate personnel from across North America.

28. The Enterprise operates through a hub-and-spoke architecture in which the Corporate Defendants and the Director and Officer Defendants constitute the corporate hub designing, controlling, and administering the Scheme, and the regional partner offices constitute the spokes through which the Scheme is executed against homeowners. The hub-and-spoke architecture operates through specific identifiable mechanisms: the alairhomes.com homepage features a "Find a local custom home builder" feature with a state-selection dropdown directing prospective homeowners to the regional partner page for their state; the alairhomes.com website contains corporate-controlled lead-generation portals through which prospective homeowners submit contact requests captured by Alair Enterprises; Alair Enterprises processes those requests through the Enterprise's standardized lead-routing architecture and directs the prospective homeowners to the appropriate regional partner. In Plaintiff's case, this routing occurred in 2019 when Plaintiff submitted a request through a corporate-controlled portal on the alairhomes.com website, and Alair Enterprises directed him to the Enterprise's Dallas regional partner, JRH Design & Build, LLC.

29. The Enterprise has a common purpose: the extraction of corporate-level margins from homeowner-funded construction transactions through the standardized inducement architecture, the standardized contracting templates, and the standardized extraction mechanisms applied uniformly across the regional partner network.

### *B. The Standardized Inducement Architecture*

30. The Enterprise's inducement architecture is designed, controlled, and disseminated by Alair Enterprises and the Director and Officer Defendants. The architecture includes: (a) brand-promise marketing materials disseminated through the corporate-controlled alairhomes.com website; (b) the standardized V092019 cost-plus construction contract template required to be used

by each regional partner in every homeowner transaction; (c) standardized lead-generation portals integrated into the alairhomes.com website; (d) standardized presentation materials, including photographic galleries of completed projects, used by regional partners in homeowner meetings; and (e) standardized representations about the Enterprise's project manager methodology, the qualifications of subcontractors performing work on Alair projects, and the transparency of the cost-plus pricing model.

31. Alair Enterprises disseminates the standardized inducement architecture across the regional partner network through the franchise license terms required of every regional partner, through standardized training programs delivered at Alair corporate facilities and through the Client Control™ platform, and through the Enterprise's annual conferences.

32. As reflected in archived captures of the alairhomes.com homepage as it existed on June 28, 2018 and on January 2, 2020, the Enterprise's standardized brand-promise architecture was continuously deployed across the period relevant to this Complaint and included: (a) the "LIVING BETTER STARTS HERE" trademark deployed as the principal brand promise; (b) the categorical brand-differentiation representation that "There are two ways to build or renovate a home... the old way or the Alair way," presenting Alair as offering a fundamentally different construction methodology than ordinary contractors; (c) the representation that "Alair's Client Control™ is the new standard in construction management designed to protect you, your dreams and your future"; (d) lead-generation forms through which Alair Enterprises captured prospective homeowner information including budget, start time, state, region, and project type; (e) the "Find a local custom home builder" feature directing Texas-resident users to the Texas regional partner page; (f) the corporate disclaimer that "Each Alair Homes business is independently owned and

operated”; and (g) the corporate copyright and trademark attribution to Alair Enterprises Canada Ltd.

### *C. The Corporate-Level Extraction Architecture*

33. The Enterprise extracts corporate-level margins from every homeowner-funded construction transaction through a standardized extraction architecture applied uniformly across the regional partner network. The extraction architecture includes: (a) a franchise royalty of approximately 4% of regional partner gross revenues; (b) an advertising fund contribution required of each regional partner pursuant to the Enterprise’s franchise license terms; (c) a common fund assessment of approximately 5% of regional partner gross revenues; and (d) a vendor-rebate kickback architecture under which regional partners are required to purchase from the vendor co-conspirators and, upon information and belief, the rebate margins on those purchases are received and retained by Alair Holdings and the Director and Officer Defendants pursuant to master rebate agreements with the vendor co-conspirators, including the approximately 51% Rona rebate retention.

34. The franchise royalty, advertising fund contribution, and common fund assessment are extracted from each regional partner’s gross revenues, which include homeowner-paid construction services. The extractions are documented in the Enterprise’s Franchise Disclosure Document and accounted for, upon information and belief, in Alair Holdings’ financial records as the holding company for the Enterprise’s financial operations and assets, as further reflected in the publicly-available financial summaries the Corporate Defendants disclose to franchise registries.

35. The vendor-rebate kickback architecture operates as follows: regional partners are required to purchase construction materials and supplies from the vendor co-conspirators; the vendor co-conspirators issue rebates on those purchases; the rebates are paid not to the regional

partner but, upon information and belief, to Alair Holdings as the holding company for the Enterprise's financial operations and assets, which retains a majority share (including approximately 51% in the case of Rona) and distributes the remainder. The vendor-rebate kickback architecture is concealed from homeowners, who pay the gross price of vendor materials through their construction contracts without disclosure that the Enterprise extracts margins from the vendor's rebate payments.

36. The corporate-level extraction architecture is invisible to homeowners. The homeowner sees only the regional partner's contract price; the homeowner does not see the corporate-level extractions embedded within that price. The Enterprise's concealment of the extraction architecture from homeowners is integral to the Scheme.

37. The causal mechanism connecting the regional-partner side and the homeowner side of the Scheme is direct and predictable. The Enterprise's extraction of the franchise royalty and the common fund assessment from the first dollar of a regional partner's gross revenue—before the partner pays rent, payroll, or a single subcontractor invoice—combined with the mandatory advertising fund contributions, the vendor-rebate retentions, and the other required payments described above, leaves the vast majority of regional partners chronically undercapitalized. A financially depleted regional partner cannot afford to hire qualified subcontractors, cannot adequately supervise the work, cannot absorb cost overruns, and cannot remedy construction deficiencies when they occur. The homeowner therefore does not receive the premium builder that the Enterprise's standardized brand-promise marketing represented; the homeowner receives a financially depleted operator who cuts corners to survive. The Enterprise designed this system with knowledge of its consequences: the Enterprise does not profit from successful construction outcomes—it profits equally whether a project succeeds or fails, because

its fees attach to regional partner gross revenue and not to construction outcomes. The regional partner's financial distress is not an unintended byproduct of the model; it is the model, and the recurring homeowner harm documented below is its foreseeable operational product.

***D. The Suppression Architecture***

38. The Enterprise operates a suppression architecture designed to prevent the discovery, publication, and aggregation of homeowner and franchisee complaints. The suppression architecture includes: (a) standardized non-disparagement provisions in the Enterprise's franchise license agreements with regional partners; (b) standardized partner-to-partner communication prohibitions limiting the ability of regional partners to share information about the Scheme; (c) search-engine-optimization suppression services that remove negative online reviews of the Enterprise and its regional partners from public search results and, upon information and belief, promote fabricated positive reviews; (d) the standardized mandatory arbitration provision at Paragraph 21.2 of the V092019 contract template that routes homeowner disputes into private proceedings closed to public scrutiny; (e) the standardized limitations-shortening provision at Paragraph 21.3 of the V092019 contract template that truncates the homeowner's window to discover and pursue claims; (f) retaliatory termination of regional partners who complain about Enterprise practices; and (g) coordinated removal and alteration of public Internet content concerning the Enterprise.

***E. The April 2025 San Diego Conference***

39. In April 2025, Alair Enterprises and the Director and Officer Defendants convened the Enterprise's annual conference at Paradise Point Resort & Spa in San Diego, California. Alair Enterprises publicly confirmed the conference and its scope through Alair's official corporate Facebook page in a post dated May 27, 2025, describing the three-day event as having "brought

together partners, teams, and industry leaders from across North America," with a program including a keynote address, two days of presentations from Alair partners and industry guest speakers, breakout sessions, networking, entertainment, and the Alair Awards gala.

40. At a presentation given during the April 2025 conference, senior management of the Enterprise mocked, in the presence of regional partners, the CBC News Marketplace investigative report titled Investigating celebrity-backed home contractors, which had aired on January 31, 2025 and documented the Enterprise's misconduct, including renovation failures experienced by homeowners and the prominent involvement of former CFL player Graeme Bell, a regional Alair partner, in the Enterprise's celebrity-endorsement marketing. The mockery was witnessed by multiple regional partners in attendance. The mockery occurred in lieu of any acknowledgment, corrective action, or distancing by the Enterprise from the documented misconduct.

***F. The Nationwide Pattern of Homeowner Harm***

41. As alleged above, the Enterprise's standardized fee-extraction architecture systematically undercapitalizes its regional partners, and the recurring homeowner harms that follow are the foreseeable operational product of that design rather than the isolated failings of any single regional partner. Although the Class Members' measured RICO injury is the corporate-level overcharge embedded in their contract prices, as alleged above, the consistency of homeowner experiences across the regional partner network corroborates the existence, scale, and nationwide uniformity of the Enterprise and its Scheme and confirms that common questions of the Scheme's operation predominate. The Enterprise maintains a 2.3-star rating on Facebook. Representative complaints from putative Class Members across multiple States and Canadian provinces reflect

the same recurring pattern—homeowners induced under the uniform Alair brand promise, followed by cost escalation, delay, abandonment, unpaid subcontractors, and liens—including:

a. A Dallas, Texas homeowner posted on Houzz in 2025: "We just finished a home renovation project with Alair, and my wife and I agree that we will never, ever use Alair again. We were initially attracted to the type of agreement discussed herein but, once we were Alair's captives by agreement, we found out that the sales pitch was actually a bunch of bologna. . . . [W]e definitely don't want someone else to endure the hell we endured for well over a year. In fact, we still find things wrong with almost everything Alair did in our home, after its principal assured us that the reason they were taking so long was because they take pride in ensuring every detail is correct. Wrong. Dallas homeowners, please beware."

b. A homeowner in Arlington, Virginia reported: "If you hire [regional partner Chad Hackmann] for a home build or renovation be prepared for cost overruns, delays, and excuse making. I have sold thousands of homes and never saw a builder this inept."

c. A homeowner in Arlington, Virginia wrote: "Very negative experience. Chad used unlicensed contractors, put incorrect information on the permits, took more than double the time to not finish the project and acted nasty and entitled. No warranties were honored."

d. A homeowner in Falls Church, Virginia posted on Yelp: "So unprofessional, by far the worst builder we have ever worked for!"

e. A homeowner in Utah reported: "We have had a terrible experience working with Alair homes in Utah. It is custom build and throughout the entire process we have had to second guess everything. We do not feel we can trust Alair!"

f. Two homeowners on Reddit wrote: "I had a horrible experience with Alair Homes and it continues to this day. AVOID ALAIR HOMES. . . . 100% agree, we would have saved money paying a fine to get rid of Alair homes SLC Utah. They are a joke, mismanaged the budget, mismanaged subs, liens on our home, our neighbors home, subs that were sleeping in our home. . . . Don't walk, Run Away from Alair Homes."

g. A Better Business Bureau complaint from South Tampa, Florida alleges: "Several sub contractors hired by the company quit. They hired new ones and asked client to pay additional to get the job completed . . . major issues have not been completed including non functional HVAC, no driveway, and many more issues."

h. A homeowner in Longmont, Colorado reported: "What a nightmare. A year and a half later and my kitchen renovation is still unfinished. Subs have apparently not been paid and the electrician is putting a lien on my home. I worked with Pat on a previous project and trusted him. He has left the state and a huge mess. Alair Homes refuses to speak to me or anyone involved."

i. A homeowner outside Berthoud, Colorado wrote on Yelp: "Abysmal builder. Two Alair homes going up simultaneously in our subdivision. . . . The Alair homes have been under construction longer than any others in the subdivision and have been eyesores. They frequently take weeks long breaks in construction during 'fragile'

stages. The house wrap on both houses as well as roof water shield were shredded by wind as the builder disappeared for weeks."

j. A homeowner in Richmond Hill, Canada complained on February 8, 2024: "[Alair] ran away with the balance of my funds leaving my home unfinished and uninhabitable. [T]hey also neglected to pay their trades resulting [in] liens being placed on my home. This company has been a pure nightmare to deal with."

k. A homeowner in Okotoks, Canada wrote: "Strongly suggest NOT hiring this company. They don't care at all about what a customer wants or needs or their budget. . . . [T]hey charge you for every phone call. . . . They gave a quote on the house we wanted to build, and we went and sold our house to go ahead with the build and once we went in to their office to finalize everything the price went up $300,000. So we had to move into a rental. . . . DON'T HIRE THIS COMPANY!!!"

## V. PLAINTIFF'S INDIVIDUAL EXPERIENCE

42. On or about May 25, 2018, Plaintiff Jeffrey E. Kowitz purchased the residential property located at 7435 Kenshire Lane, Dallas, Texas 75230.

43. Within weeks of Plaintiff's May 25, 2018 purchase, Plaintiff first encountered the Alair Homes brand through the Houzz home-renovation platform. Plaintiff thereafter accessed the alairhomes.com website directly to evaluate the Alair brand and to review the Enterprise's standardized marketing materials. Plaintiff personally encountered the Enterprise's brand-promise marketing materials and recalls representations using the terms like "premium," "high-end," "custom," and "award-winning."

44. In 2019, after Plaintiff had researched the Alair Homes brand through the alairhomes.com website, Plaintiff used the corporate-controlled lead-generation portal integrated

into the alairhomes.com website to submit a request for contact concerning a potential renovation project at his Dallas, Texas residence. Alair Enterprises received Plaintiff's submission through the corporate-controlled portal and directed Plaintiff to the Enterprise's Dallas regional partner, JRH Design & Build, LLC. The corporate-to-Plaintiff channel was completed at the moment Alair Enterprises routed Plaintiff to JRH through the Enterprise's corporate-controlled portal.

45. Following Alair Enterprises' routing of Plaintiff to JRH, Plaintiff met in person at JRH's Dallas office with James Hammel, a JRH principal. At the meeting, Hammel, acting as JRH's representative and pursuant to the Enterprise's standardized marketing and inducement architecture, showed Plaintiff a presentation displaying photographs of completed Alair-branded projects representing the Enterprise's premium custom-build capabilities. Hammel made representations to Plaintiff concerning the Enterprise's project manager methodology, the qualifications of subcontractors who would work on Plaintiff's project, and the cost-plus pricing methodology.

46. In reasonable reliance on the Enterprise's standardized inducement architecture, Plaintiff paid the Dallas regional partner over $20,000 in 2019 for a first cost estimate for an interior and exterior remodel of the Dallas property. The estimate produced projected approximately $1,000,000 in total construction cost, which exceeded Plaintiff's anticipated budget.

47. In early 2020, again in reasonable reliance on the Enterprise's standardized inducement architecture, Plaintiff paid the Dallas regional partner an additional sum exceeding $20,000 for a second cost estimate for an exterior-only remodel. Both estimating fees were paid pursuant to the Enterprise's standardized cost-estimating architecture and were transferred to and retained by the regional partner pursuant to the Enterprise's franchise license terms, with the

Enterprise extracting franchise royalty, common fund, and other corporate-level exactions from the regional partner's gross revenues including the estimating fees received from Plaintiff.

48. On June 22, 2020, Plaintiff executed a construction contract with JRH using the V092019 contract template, the Enterprise's standardized cost-plus construction contract template bearing the Alair Homes logo and the version control identifier V092019 in the footer of each page. The V092019 contract was presented to Plaintiff in completed form. Plaintiff was not permitted to negotiate the standardized terms of the contract, including Paragraph 18 (the corporate-insulation provision), Paragraph 19 (the consequential-damages waiver), Paragraph 21.2 (the mandatory-arbitration provision), or Paragraph 21.3 (the limitations-shortening provision). The standardized terms were take-it-or-leave-it conditions of engaging the Dallas regional partner under the Alair Homes brand.

49. Plaintiff's execution of the V092019 contract on June 22, 2020 was the consummation of the Enterprise's standardized inducement architecture, not the source of Plaintiff's relationship with the Enterprise. Plaintiff's exposure to the Enterprise began in 2018 and continued through the contract execution; Plaintiff's pre-contract economic injury exceeded $40,000 before the contract was executed.

## VI. PREDICATE ACTS OF MAIL AND WIRE FRAUD

50. In furtherance of the Scheme, Defendants and their co-conspirators committed repeated acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The predicate acts include, without limitation, the following.

***A. The V092019 Template Transmission to Plaintiff***

51. The most documentary and direct channel through which Defendants reached Plaintiff in connection with the inducement that gave rise to Plaintiff's RICO injury was the transmission of the Enterprise's standardized V092019 cost-plus construction contract template to Plaintiff on June 22, 2020. The V092019 template, generated and version-controlled by Alair Enterprises and the Director and Officer Defendants, was disseminated to Plaintiff through the Enterprise's Dallas regional partner functioning as messenger rather than as author of the contracting instrument. The transmission of the V092019 contract template constitutes wire fraud and/or mail fraud within the meaning of 18 U.S.C. §§ 1341 and 1343.

***B. The alairhomes.com Brand-Promise Marketing***

52. In addition to the V092019 contract transmission, Defendants reached Plaintiff through the Enterprise's standardized brand-promise marketing disseminated through the alairhomes.com website during the period leading up to Plaintiff's contract execution. The marketing operated in conjunction with the V092019 template to constitute the Enterprise's standardized inducement architecture deployed against Plaintiff. Alair Enterprises, the Director and Officer Defendants, and others designed, approved, and disseminated the standardized brand-promise marketing content through the alairhomes.com website using interstate wires. The dissemination of the brand-promise marketing constitutes wire fraud within the meaning of 18 U.S.C. § 1343.

***C. The 2019 Lead-Generation Portal Routing***

53. In 2019, Plaintiff used the corporate-controlled lead-generation portal on the alairhomes.com website to submit a request for contact. Alair Enterprises received the request through the corporate-controlled portal, processed the request through the Enterprise's

standardized lead-routing architecture, and directed Plaintiff to the Enterprise's Dallas regional partner. Alair Enterprises' use of interstate wires to receive Plaintiff's submission and to route Plaintiff to the Dallas regional partner constitutes wire fraud within the meaning of 18 U.S.C. § 1343.

***D. Alair-Branded Billing***

54. Throughout the period of Plaintiff's construction project from June 2020 forward, Defendants' Dallas regional partner transmitted to Plaintiff Alair-branded billing communications, including invoices and payment requests bearing the Alair Homes logo and corporate branding. These communications were transmitted using interstate wires and/or the mails, and constitute additional predicate acts within the meaning of 18 U.S.C. §§ 1341 and 1343.

***E. Plaintiff's Payments***

55. Throughout the period of Plaintiff's construction project, Plaintiff transmitted payments to the Dallas regional partner in reliance on the Enterprise's inducement architecture. Plaintiff's payments were ultimately distributed across the Enterprise pursuant to the Enterprise's standardized extraction architecture, including the franchise royalty, the common fund assessment, the advertising fund contribution, and the vendor-rebate retention. The transmission and distribution of Plaintiff's payments constitute additional predicate acts within the meaning of 18 U.S.C. §§ 1341 and 1343.

***F. Network-Wide Predicate Acts***

56. Throughout the period relevant to this Complaint, Defendants and their co-conspirators have committed thousands of additional predicate acts of mail and wire fraud directed at the Class Members and the regional partners. These predicate acts include, without limitation: (a) the continued operation of the Enterprise's standardized brand-promise marketing through the

alairhomes.com website and other corporate-controlled channels; (b) the continued transmission of the V092019 contract template (and any successor template performing the same function) to homeowners across the regional partner network; (c) the continued use of corporate-controlled lead-generation portals to route prospective homeowners to regional partners; (d) the continued transmission of Alair-branded billing and project-management communications to homeowners across the network; (e) the continued extraction of franchise royalties, common fund assessments, advertising fund contributions, and vendor-rebate margins through interstate wire transmissions; (f) the continued operation of the suppression architecture, including search-engine-optimization suppression and Internet content scrubbing; (g) the October 2024 RENXHomes interview through which Defendant Cecil disseminated false representations about the Enterprise's nature; (h) the April 2025 San Diego conference at which senior management mocked the CBC News investigative report; and (i) the standardized franchisee-fraud predicates, including the 2022–2024 Client Control™ software rollout under which the Enterprise extracted approximately $30,000 per partner in training fees for a platform that multiple partners have described as inoperable.

## VII. THE V092019 CONTRACT AND HOPEWELL DECLARATION AS DOCUMENTARY EVIDENCE OF THE SCHEME

57. The construction contract executed between Plaintiff and JRH on June 22, 2020 was presented to Plaintiff in completed form by JRH at the time of contract execution. Plaintiff was not permitted to negotiate the standardized terms of the contract, including Paragraph 18 (the corporate-insulation provision), Paragraph 19 (the consequential-damages waiver), Paragraph 21.2 (the mandatory-arbitration provision), or Paragraph 21.3 (the limitations-shortening provision). The standardized terms were take-it-or-leave-it conditions of engaging the Dallas regional partner under the Alair Homes brand. JRH was required by the Enterprise's franchise license terms to use the V092019 template in every homeowner transaction conducted under the Alair Homes brand

and was prohibited from modifying its standardized provisions. Plaintiff's signature on the V092019 contract was not evidence of arm's-length negotiation between Plaintiff and JRH; it was the consummation of the Enterprise's standardized inducement architecture by Plaintiff's acceptance of the Enterprise's standardized contracting terms.

58. The construction contract executed between Plaintiff and JRH on June 22, 2020 is the standardized cost-plus construction contract template designated V092019, generated and approved at Alair corporate offices, bearing the Alair Homes logo, and required by Defendants to be used by each of the approximately 109 Alair regional partner offices in every homeowner construction transaction conducted under the Alair Homes brand. The version control identifier V092019 appearing in the footer of each page of the contract is documentary evidence of the contract's corporate-template provenance. The contract is not the product of arm's-length negotiation between Plaintiff and JRH. The contract is the Enterprise's standardized contracting instrument, designed at the corporate level by Defendants and deployed identically across the regional partner network in transactions with homeowners. The network-wide standardization of the V092019 template is itself the documentary basis for the common questions of law and fact predominating in the class allegations pleaded below: every homeowner across the network executed the same standardized contract, containing the same corporate-imposed provisions, subject to the same Scheme architecture.

59. Each provision of the V092019 contract relevant to Defendants' Motion to Dismiss was designed by Defendants and serves a Scheme function. Paragraph 18 (the corporate-insulation provision), Paragraph 19 (the consequential-damages waiver), Paragraph 21.2 (the mandatory-arbitration provision), and Paragraph 21.3 (the limitations-shortening provision) are not the product of arm's-length negotiation between Plaintiff and JRH. Each was designed by Defendants

as part of the Enterprise's standardized concealment and risk-transfer architecture, and each was deployed by Defendants across the regional partner network in every Alair homeowner contract.

***Paragraph 18.***

60. Paragraph 18 acknowledges that Alair Corporate has no contractual relationship with the homeowner. The provision was designed by Defendants to insulate the Enterprise from homeowner liability for the Scheme. The provision is a documentary instrument of the Enterprise's concealment architecture, parallel to the corresponding disclaimer on the alairhomes.com website that "Each Alair Homes business is independently owned and operated." Defendants designed the contract to lead the homeowner to believe that Alair Corporate's role in the transaction was limited to brand licensing, when in fact Alair Corporate designed the inducement architecture that brought the homeowner to the transaction, controlled the contract template through which the homeowner entered the transaction, administered the vendor-rebate kickback architecture that extracted margins from the homeowner's vendor purchases, and collected franchise royalties and common fund assessments from the homeowner's payments to the regional partner.

***Paragraph 19.***

61. Paragraph 19 waives consequential damages. The provision was designed by Defendants to limit the homeowner's remedies in any dispute and to reduce the financial exposure of the Enterprise and its regional partners to homeowner claims.

***Paragraph 21.2.***

62. Paragraph 21.2 requires mandatory private arbitration of all disputes. The provision was designed by Defendants to route all homeowner disputes into private proceedings closed to public scrutiny, preventing the publication of homeowner complaints and the development of cross-homeowner pattern evidence that would expose the Scheme. The arbitration-routing

function is enforced network-wide by Defendant Hopewell as the Enterprise's Chief Compliance Officer.

***Paragraph 21.3.***

63. Paragraph 21.3 contains a one-year limitations-shortening provision. The provision was designed by Defendants to truncate the homeowner's window to discover and pursue claims, ensuring that the homeowner's limitations period would expire before the homeowner could reasonably discover the corporate-level Scheme through ordinary investigation.

64. No individual provision among Paragraphs 18, 19, 21.2, and 21.3 should be evaluated in isolation. The four provisions together constitute the Enterprise's integrated concealment and risk-transfer architecture, each serving a distinct function in the architecture's overall design: Paragraph 18 conceals the corporate-level identity of the inducing party; Paragraph 19 limits the homeowner's recoverable damages once the Scheme is discovered; Paragraph 21.2 routes the homeowner's claims into private proceedings that prevent cross-homeowner pattern development; Paragraph 21.3 truncates the homeowner's window to discover and pursue claims before reasonable investigation could expose the Scheme. The four provisions were not separately negotiated commercial terms; they were components of a coordinated corporate design, generated together, version-controlled together, disseminated together, and required to be used together by each regional partner in every homeowner contract.

65. Plaintiff sustained pre-contract economic injury in reliance on Defendants' standardized inducement architecture before the V092019 contract was executed on June 22, 2020. Plaintiff's exposure to the Enterprise's inducement architecture began in 2018 and continued through June 22, 2020, as described in Section V above. In reasonable reliance on the Enterprise's standardized inducement architecture, Plaintiff paid the Dallas regional partner over $20,000 in

2019 for a first cost estimate for an interior and exterior remodel, and over $20,000 in early 2020 for a second cost estimate for an exterior-only remodel. These pre-contract payments are documentary evidence of Plaintiff's reasonable reliance on the Enterprise's inducement architecture before any contract between Plaintiff and JRH existed. The RICO injury Plaintiff sustained is the inducement itself, by which Defendants caused Plaintiff to engage in transactions with the Enterprise's regional partner; the pre-contract payments are evidence that the inducement was successful and that Plaintiff parted with consideration in reliance on it. Defendants' standardized inducement architecture was the proximate cause of the pre-contract payments, the subsequent contract execution, and the corporate-level overcharge embedded in the contract price.

66. On May 8, 2026, Defendant Stuart Hopewell, in his continuing capacity as the Chief Compliance Officer of Alair Enterprises USA, Inc. and Alair Enterprises USA Holdings, Inc., executed a Declaration filed in this Court (ECF 7-2 at 29-30) attesting under penalty of perjury that: (a) Hopewell's continuing duties as Chief Compliance Officer of both Corporate Defendants include overseeing litigation for Alair Enterprises and Alair Holdings; (b) Hopewell's continuing duties include ensuring compliance with Defendants' internal policies, including Defendants' "internal requirement to receive and maintain copies of construction contracts entered by [Defendants'] franchisees"; (c) Hopewell has "personal involvement in all of Alair Enterprises and Alair Holdings' dealings related to JRH Design & Build, LLC"; and (d) the V092019 contract between Plaintiff and JRH was made and kept by Defendants in the regular course of Defendants' business, by persons with knowledge of the matters set forth in the contract, as part of Defendants' regularly conducted business activity.

67. The Hopewell Declaration's substantive admissions describe Defendants' continuing corporate practices and Hopewell's continuing corporate role, not litigation-specific

authority or post-dispute document collection. The "internal requirement to receive and maintain copies of construction contracts entered by [Defendants'] franchisees" is a continuing business practice applicable to all of Defendants' regional partners across the network, not a litigation-driven document collection specific to the Kowitz dispute. Hopewell's "personal involvement in all of Alair Enterprises and Alair Holdings' dealings related to JRH" describes his ongoing corporate role over the period of the regional partner relationship, not litigation-specific authority arising after the dispute. The Hopewell Declaration is documentary evidence of Alair Corporate's continuing operational involvement in the JRH–Plaintiff transaction at the corporate record-keeping, compliance, and litigation-oversight levels. Defendants' representation in their Motion to Dismiss that Alair Corporate has no relationship to the transaction is directly contradicted by Defendants' own sworn Declaration filed in support of that Motion. The Hopewell Declaration further contradicts Defendants' February 2024 representation to the 192nd Judicial District Court of Dallas County, Texas in the Rule 202 proceeding (Cause No. DC-23-20994) that Defendants "have nothing to do with the Project and there is no relationship between JRH and Alair USA that would subject Respondents to vicarious liability." Defendants' sworn position before this Court that they had personal involvement in all dealings related to JRH and maintained an internal requirement to receive and maintain the JRH–Plaintiff contract is irreconcilable with Defendants' prior representation that they had nothing to do with the Project.

## VIII. DISCOVERY OF THE SCHEME AND STATUTE OF LIMITATIONS

68. Plaintiff's claims are timely under the applicable four-year statute of limitations for RICO claims. Plaintiff's knowledge of the Enterprise-level Scheme that is the subject of this action did not arise, and could not reasonably have arisen, until well within the limitations window preceding the April 16, 2026 filing of this action.

69. Two distinct universes of injury are relevant to the limitations analysis. The first universe consists of Plaintiff's project-level injuries, including construction defects, mechanics' liens, project delays, and similar harms, which arose from JRH's performance failures under the V092019 contract. Those project-level injuries are the subject of the parallel AAA Arbitration filed by Plaintiff against JRH on April 20, 2022. The second universe consists of Plaintiff's inducement injury, which is the corporate-level overcharge embedded in the V092019 contract price through the Enterprise's standardized extraction architecture, and which is the subject of this RICO action. The project-level injuries and the inducement injury are factually and legally distinct.

70. The inducement injury is the RICO injury. Plaintiff was induced by the Enterprise's standardized inducement architecture to engage in transactions with the Enterprise's Dallas regional partner. The inducement caused Plaintiff to pay over $40,000 in pre-contract cost-estimate fees in 2019 and 2020, to execute the V092019 contract on June 22, 2020, and to pay the full contract price embedding the corporate-level extractions. The inducement injury accrued at the moment of each payment and at the moment of contract execution; the inducement injury was concealed from Plaintiff by the Enterprise's standardized inducement and concealment architecture.

71. Plaintiff discovered, or reasonably could have discovered, the inducement injury and the Enterprise-level Scheme only through Plaintiff's investigation in 2025 and 2026. Knowledge of JRH's project-level performance failures was not, and could not reasonably have been, discovery of the Enterprise-level Scheme. The Enterprise-level Scheme is conceptually, factually, and legally distinct from project-level construction failures. The Enterprise-level Scheme involves: (a) the existence of a coordinated nationwide enterprise operating through approximately 109 offices across 13 U.S. states and 5 Canadian provinces; (b) the deployment of

standardized fraudulent marketing materials approved at the corporate level; (c) the operation of a systematic vendor-rebate kickback architecture concealed from homeowners; (d) the suppression of homeowner and franchisee complaints through search-engine-optimization manipulation, mandatory arbitration, and standardized non-disparagement provisions; and (e) the direction of Enterprise proceeds to fund the Director and Officer Defendants' personal property holdings. These facts were not discoverable through reasonable diligence based on knowledge of JRH's individual project failures.

72. The inducement injury itself was concealed by the Enterprise's standardized concealment architecture. Paragraph 18 of the V092019 contract represented to Plaintiff that Alair Corporate had no contractual relationship with him, when in fact Alair Corporate designed the contract that brought him into the transaction, controlled the inducement architecture that led to the contract, and extracted corporate-level margins from his payments. Paragraph 21.2 routed disputes into private arbitration that prevented Plaintiff from discovering similarly situated victims. Paragraph 21.3 truncated the limitations period to deny Plaintiff time to investigate. The alairhomes.com website disclaimer that "Each Alair Homes business is independently owned and operated" reinforced the corporate-insulation representation. The Enterprise's search-engine-optimization suppression of negative reviews prevented Plaintiff from discovering similarly situated victims through ordinary Internet research. These concealment mechanisms operated identically on every Class Member and tolled the running of the statute of limitations under the doctrines of equitable tolling, fraudulent concealment, and equitable estoppel.

73. The November 12, 2021 demand letter sent by Plaintiff's prior counsel at Jackson Walker LLP to Alair Enterprises USA, Inc., attached to and incorporated by reference in Plaintiff's April 20, 2022 AAA Arbitration Demand, does not constitute discovery of the Enterprise-level

Scheme. The November 12, 2021 letter concerned Plaintiff's project-level Texas DTPA claims arising from JRH's performance failures and was directed to Alair Corporate as a then-believed potential JRH-related party. The letter does not reflect knowledge of the corporate-level Scheme architecture pleaded in this Complaint.

74. Plaintiff's investigation of the Enterprise-level Scheme proceeded as follows:

a. December 18, 2023: Plaintiff filed the original Verified Petition Requesting Deposition Duces Tecum Before Suit in Cause No. DC-23-20994 in the 192nd Judicial District of Dallas County, Texas (the "Rule 202 Petition"), seeking pre-suit discovery from Alair Enterprises USA, Inc. and Alair Enterprises USA Holdings, Inc. to investigate potential claims arising out of the conduct described in this Complaint.

b. February 29, 2024: The Corporate Defendants filed a substantive Response to the Rule 202 Petition opposing the requested discovery and representing to the state court that the Corporate Defendants "have nothing to do with the Project and there is no relationship between JRH and Alair USA that would subject Respondents to vicarious liability." That February 2024 representation is irreconcilable with the position Defendants subsequently took before this Court on May 8, 2026 through the Hopewell Declaration.

c. August 7, 2024: Plaintiff filed a Verified First Amended Original Petition Requesting Depositions Duces Tecum Before Suit, seeking to further pursue the pre-suit discovery against the Corporate Defendants.

d. October 31, 2024: Plaintiff filed a Verified Second Amended Original Petition Requesting Depositions Duces Tecum Before Suit. The continuing escalation of the

Rule 202 proceeding documents Plaintiff's reasonable diligence in pursuing the Enterprise-level investigation.

e. October 2024 through January 31, 2025: Publicly available information emerged that materially advanced Plaintiff's investigation. In October 2024, Defendant Cecil gave an interview published by RENXHomes in which Cecil acknowledged the Enterprise is "only by legal definition a franchise system" and described the "built-in investor group." On January 31, 2025, CBC News Marketplace broadcast its investigative report titled Investigating celebrity-backed home contractors, which documented homeowner harm at the hands of Alair regional partners and the Enterprise's role in celebrity-endorsement marketing. The May 27, 2025 Alair Homes corporate Facebook post confirming the April 2025 San Diego conference at Paradise Point Resort & Spa added additional documentary evidence during Plaintiff's investigation period.

f. February 6, 2025: The state court entered an order in Cause No. DC-23-20994 governing the procedural posture of the Rule 202 proceeding.

g. February 24, 2025: The parties filed an Unopposed Motion to Abate the Rule 202 proceeding pending resolution of the parallel AAA Arbitration against JRH.

h. February 27, 2025: The state court granted the Unopposed Motion to Abate.

i. September 12, 2025: Plaintiff's counsel filed a Motion for Leave to Amend the Rule 202 Petition in Cause No. DC-23-20994, attaching a proposed Verified Third Amended Class Action Petition as Exhibit A. The motion represented to the state court that Plaintiff was seeking to narrow the scope of pre-suit Rule 202 discovery in order to complete specific areas of the proposed Class Action Petition, including

discovery on the corporate structure and actual legal relationships between the Alair corporate Defendants and their "regional partners" or "franchisees," and on the representations the Alair corporate Defendants were making to the public. The Alair corporate Defendants opposed the motion. The September 12, 2025 filing is documentary evidence that, approximately seven months before the filing of this Complaint, Plaintiff's investigation was still actively developing and Plaintiff was still seeking additional pre-suit corporate discovery to complete the factual foundation for federal claims.

j. January 2026 through April 2026: Plaintiff's investigation continued through interviews with former Alair regional partners and insiders, who provided independent testimony corroborating the Enterprise-level Scheme architecture and identifying specific Director and Officer Defendants' operational roles in the Scheme. Plaintiff filed this action on April 16, 2026 promptly after the investigation reached sufficient development to support federal claims.

75. Throughout the period relevant to the limitations analysis, Defendants engaged in affirmative acts of concealment that tolled the running of the statute of limitations, including: (a) the deployment of the corporate-insulation provision at Paragraph 18 of the V092019 contract in every Alair homeowner contract; (b) the deployment of the mandatory-arbitration provision at Paragraph 21.2 in every Alair homeowner contract, routing disputes into private proceedings; (c) the deployment of the limitations-shortening provision at Paragraph 21.3 in every Alair homeowner contract; (d) the "Each Alair Homes business is independently owned and operated" disclaimer on the alairhomes.com website; (e) the standardized non-disparagement provisions and partner-to-partner communication prohibitions in the Enterprise's franchise license agreements;

(f) the search-engine-optimization suppression of negative reviews and homeowner complaints; (g) Defendants' February 2024 representation to the state court that they "have nothing to do with the Project," which actively contradicted Defendants' continuing involvement now documented in the Hopewell Declaration; (h) the coordinated removal of public Internet content concerning the Enterprise; and (i) Defendants' initial concealment of corporate operational involvement from Plaintiff during the Rule 202 proceeding, contradicted only when Defendants filed the Hopewell Declaration in this action.

76. Plaintiff exercised reasonable diligence in investigating his potential claims at every stage. The continuing escalation of the Rule 202 proceeding from December 2023 forward, the development of the evidentiary record from October 2024 forward, and the prompt filing of this federal action within approximately seven months of the September 12, 2025 state-court filing all reflect reasonable diligence. Defendants' active concealment, not Plaintiff's lack of diligence, accounts for any delay between the underlying conduct and the discovery of the Enterprise-level Scheme.

77. Independent of any tolling doctrine, Plaintiff's RICO claims include predicate acts that occurred within the four-year limitations window preceding the April 16, 2026 filing. Defendants' continued operation of the Scheme, including the continued dissemination of the V092019 template (or any successor template performing the same function), the continued operation of the corporate-controlled marketing and lead-generation channels, the continued extraction of franchise royalties and common fund assessments, the continued operation of the vendor-rebate kickback architecture, the continued operation of the suppression architecture, the October 2024 RENXHomes interview, and the April 2025 San Diego conference, each constitute predicate acts within the limitations window.

78. Defendants are equitably estopped from asserting the statute of limitations as a defense because Defendants' active concealment of the Scheme, including through the four-provision concealment architecture in every Alair homeowner contract and through the suppression architecture, prevented Plaintiff from discovering the Scheme within the limitations period.

79. For purposes of class allegations, the continuing operation of the Enterprise constitutes a continuing violation. Each application of the Scheme to a new homeowner, including each transmission of the V092019 template (or any successor template performing the same function), each routing of a homeowner through the corporate-controlled lead-generation channels, and each extraction of corporate-level margins through the standardized extraction architecture, constitutes a new predicate act and a new injury within the limitations period. Class Members whose contracts predate the four-year window preceding the filing of this Complaint are protected by the same fraudulent concealment, equitable estoppel, and discovery rule doctrines that protect Plaintiff, because the concealment architecture operated identically on every Class Member.

## IX. CLASS ACTION ALLEGATIONS

80. Plaintiff brings this case on behalf of himself and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed Nationwide Class is defined as follows:

> Nationwide Class: All persons and entities within the United States (including its Territories and the District of Columbia) who, during the period from 2019 to the date of class certification (the "Class Period"), entered into a construction agreement with an Alair regional partner or franchisee for home remodeling or building services using the V092019

contract template or any other Alair-branded construction contract template that (a) was generated and version-controlled by Defendants, (b) was required to be used by Alair regional partners in homeowner transactions, and (c) contained provisions substantially equivalent to Paragraphs 18, 19, 21.2, and 21.3 of the V092019 template.

81. Expressly excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their immediate families; (b) Defendants and any entities in which Defendants have a controlling interest, or which have a controlling interest in Defendants, and their legal representatives, assigns, and successors; (c) Defendants' employees, affiliates, officers, and directors; and (d) any class member who timely and properly executes and files a request for exclusion from the Class.

82. Plaintiff reserves the right to amend or modify the Class definition, including the Class Period and the contract template specifications, at the class certification stage or at any other stage of the litigation, if further investigation and discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

83. The Class as defined in this Complaint does not include the Enterprise's regional partners or franchisees, who have been separately injured by the Scheme through the extraction architecture and other conduct described in this Complaint. Plaintiff does not seek to represent the franchisee class in this action, and the franchisee class is reserved for separate litigation if appropriate.

***Fed. R. Civ. P. 23(a) Prerequisites***

84. Numerosity. The exact number of Class Members is unknown, as such information is in the exclusive control of Defendants. Defendants operate approximately 109 regional partner

offices across 13 U.S. states and 5 Canadian provinces; have been in operation since 2007; have grown from approximately 100 partner offices in November 2023 to approximately 109 partner offices as of the date of this Complaint; and enforce minimum annual revenue requirements of approximately $5 million per partner. The Hopewell Declaration filed in this Court at ECF 7-2 confirms that Defendants maintain an internal requirement to receive and maintain copies of construction contracts entered by Defendants' regional partners with homeowners, establishing that Defendants possess the records identifying the Class Members. Upon information and belief, the Nationwide Class numbers in the thousands. The Class is so numerous that joinder of all members is impracticable.

85. Commonality. Common questions of law and fact affect the rights of each Class Member, and common relief by way of damages is sought for Plaintiff and Class Members. These common questions include, but are not limited to:

a. whether the Alair Homes Enterprise constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4);

b. whether Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) through repeated acts of mail fraud and wire fraud directed at the Class Members;

c. whether Defendants conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

d. whether Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d);

e. whether the corporate-level extraction architecture applied uniformly to each Class Member's construction transaction, including one or more of the franchise royalty, advertising fund contribution, common fund assessment, or vendor-rebate kickback architecture;

f. whether the Director and Officer Defendants directed, controlled, and participated in the operation and management of the Enterprise;

g. whether Plaintiff and the Class Members sustained injury to their business or property by reason of Defendants' RICO violations within the meaning of 18 U.S.C. § 1964(c); and

h. whether Plaintiff and the Class Members are entitled to actual damages, treble damages, attorneys' fees, costs, and equitable relief including disgorgement and the imposition of a constructive trust.

86. Typicality. The claims and defenses of Plaintiff are typical of the claims and defenses of the Class because Plaintiff was subjected to the same uniform inducement architecture, the same standardized V092019 contract template, the same corporate-level extraction architecture, and the same integrated concealment architecture as all Class Members. Plaintiff's injury arose from the same Scheme, executed through the same corporate-template instruments, that injured every Class Member.

87. Adequacy. Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff has no conflict of interest that will interfere with the maintenance of this class action; his claims are the same as the Class Members he seeks to represent. Plaintiff's parallel arbitration proceedings against JRH Design & Build, LLC concern project-level damages distinct from the corporate-level damages sought in this action, and Plaintiff's pursuit of project-level

remedies against JRH does not create any conflict of interest with the Class's interest in recovering corporate-level damages from Defendants. Plaintiff understands his obligations to the Class, is committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests of the Class. Plaintiff has retained trial counsel with substantial experience in complex, commercial, class action, and RICO litigation who will adequately represent the interests of the Class.

***Fed. R. Civ. P. 23(b)(3) Prerequisites***

88. Predominance. The common questions of law and fact set forth above predominate over any questions affecting only individual Class Members. The Enterprise's Scheme was standardized and uniform across the network: the V092019 contract template was the same in every homeowner transaction; the brand-promise marketing was disseminated through the same corporate-controlled alairhomes.com website; the corporate-level extraction architecture was applied uniformly to each regional partner's revenues; the concealment architecture was deployed identically in every homeowner contract. Because Plaintiff's RICO claims are predicated on mail and wire fraud, first-party reliance is not a required element of the claims; the statute requires only that each Class Member's injury was "by reason of" Defendants' RICO violation. The V092019 standardization, the documentary evidence confirming the network-wide architecture (including the Hopewell Declaration's confirmation that Defendants maintain copies of all such contracts), and the formulaic damages methodology together establish that the questions of liability and the methodology of damages calculation are common to all Class Members. Individual variation in the precise mix of corporate-level extractions applicable to each Class Member's specific transaction does not defeat predominance because the underlying extraction methodology is class-common, the variation is mechanical rather than substantive, and the data necessary to calculate

each Class Member's damages is available from Defendants' own records and the records of the vendor co-conspirators. All claims pleaded in this Complaint arise under federal law, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968; the federal claims are uniform across the Nationwide Class and do not require state-by-state choice-of-law analysis.

89. Damages Methodology. Individual damages are calculable on a class-wide basis using common evidence and a formulaic methodology. Each Class Member's damages consist of the proportionate share of corporate-level Scheme extraction attributable to that Class Member's construction transaction, calculated as the sum of: (a) the franchise royalty extracted from the Class Member's payments (approximately 4% of regional partner gross revenues attributable to the Class Member's transaction); (b) the common fund assessment extracted from the Class Member's payments (approximately 5% of regional partner gross revenues attributable to the Class Member's transaction); (c) the vendor-rebate margins extracted from the Class Member's vendor purchases, where applicable (calculated using the vendor-rebate retention rates set forth in the master vendor agreements between Defendants and the vendor co-conspirators, including the approximately 51% Rona rebate retention); (d) the advertising fund contribution extracted from the Class Member's payments, where applicable; and (e) any other corporate-level exactions identified through discovery. The damages methodology is the same for every Class Member; the calculation requires only the Class Member's contract value and the Defendants' corporate-level extraction rates, both of which are documentable from Defendants' own records and the records of the vendor co-conspirators.

90. Superiority. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Defendants' wrongful conduct was directed at Class

Members uniformly through the Enterprise's standardized architecture. Class Members have all sustained the same type of injury, calculated by the same methodology, arising from the same Scheme. Absent a class action, most Class Members would find the cost of litigating their individual claims prohibitively high relative to the recoverable damages per Class Member. The corporate-insulation provision at Paragraph 18 of every Class Member's contract has, by Defendants' design, led many Class Members to believe that they have no claim against the corporate Defendants. Absent class treatment, Class Members will continue to incur damages, the Scheme will continue to operate, and Defendants' misconduct will continue without effective remedy. A class action provides the fair, consistent, and efficient mechanism for adjudicating these common claims.

91. Declaratory and Injunctive Relief. Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the Class. Class-wide relief and Court supervision under Rule 23 will ensure consistent treatment of all Class Members and uniformity in Defendants' compliance with any equitable obligations imposed by the Court, including disgorgement of Scheme proceeds and the imposition of a constructive trust over Defendants' holdings derived from the Scheme.

## X. CAUSES OF ACTION

### *COUNT ONE: Violation of 18 U.S.C. § 1962(c) Against the Corporate Defendants*

92. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

93. The Alair Homes Enterprise, as described in Section IV above, constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and affecting interstate commerce.

94. Defendants Alair Enterprises USA, Inc. and Alair Enterprises USA Holdings, Inc. are persons within the meaning of 18 U.S.C. § 1961(3) and are distinct from the Enterprise.

95. Each Corporate Defendant conducted and participated, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). Alair Enterprises, as the operating company, conducted the affairs of the Enterprise by owning and controlling the corporate-controlled marketing and lead-generation architecture, generating and version-controlling the V092019 contract template, disseminating the standardized inducement architecture across the regional partner network, and routing prospective homeowners, including Plaintiff, to the regional partner offices. Alair Holdings, as the holding company, conducted the affairs of the Enterprise by, upon information and belief, receiving, holding, and channeling the corporate-level margins extracted from homeowner-funded construction transactions through the Enterprise's standardized extraction architecture upward through the integrated corporate structure. The pattern of racketeering activity consists of the predicate acts of mail fraud and wire fraud described in Section VI above, committed continuously over the period of the Enterprise's operation.

96. Plaintiff and the Class Members were injured in their business and property by reason of the Corporate Defendants' violations of 18 U.S.C. § 1962(c). The injuries include, without limitation: (a) the corporate-level overcharge embedded in the Class Members' construction contract prices through the Enterprise's standardized extraction architecture; (b) Plaintiff's pre-contract economic injury exceeding $40,000 paid in 2019 and 2020 for cost estimates produced pursuant to the Enterprise's standardized cost-estimating architecture; and (c) Plaintiff's and the Class Members' post-contract payments distributed across the Enterprise pursuant to the standardized extraction architecture.

97. Plaintiff and the Class Members are entitled, pursuant to 18 U.S.C. § 1964(c), to recover threefold their actual damages, attorneys' fees, and costs.

***COUNT TWO: Violation of 18 U.S.C. § 1962(c) Against the Director and Officer Defendants***

98. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

99. The Alair Homes Enterprise constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and affecting interstate commerce.

100. Defendants Robert F. Cecil, Blair McDaniel, Katrina McLauchlan, Duane Johns, and Stuart Hopewell are persons within the meaning of 18 U.S.C. § 1961(3) and are distinct from the Enterprise.

101. Each of the Director and Officer Defendants directed, controlled, and participated in the operation and management of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c), as described in Section III.C above. Each Director and Officer Defendant occupied a senior-executive role within the Enterprise during the period of the Scheme alleged in this Complaint and exercised authority over the design, implementation, or continuing operation of the Scheme's specific functional architectures.

102. Plaintiff and the Class Members were injured in their business and property by reason of the Director and Officer Defendants' violations of 18 U.S.C. § 1962(c). Plaintiff and the Class Members are entitled, pursuant to 18 U.S.C. § 1964(c), to recover threefold their actual damages, attorneys' fees, and costs.

***COUNT THREE: Violation of 18 U.S.C. § 1962(d) (Conspiracy) Against All Defendants***

103. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

104. Defendants conspired with each other and with the regional partners and vendor co-conspirators to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Each Defendant knowingly agreed to the overall objective of the Scheme: to extract corporate-level margins from homeowner-funded construction transactions through the Enterprise's standardized inducement, contracting, and extraction architecture, while concealing the existence and operation of the architecture from homeowners through the standardized concealment architecture.

105. The agreement among the conspirators is documented by, among other evidence: (a) the Enterprise's standardized franchise license terms requiring each regional partner to use the V092019 contract template and to participate in the corporate-level extraction architecture; (b) the master vendor agreements between Defendants and the vendor co-conspirators establishing the rebate-kickback architecture; (c) the Enterprise's standardized training programs disseminating the Scheme architecture to regional partners; (d) the Enterprise's annual conferences, including the April 2025 San Diego conference at which senior management mocked the CBC News investigative report in the presence of regional partners, demonstrating shared knowledge and continuing agreement; and (e) the continuing participation of each regional partner in the Enterprise after the public emergence of investigative reporting documenting the Scheme.

106. Plaintiff and the Class Members were injured in their business and property by reason of Defendants' conspiracy to violate 18 U.S.C. § 1962(c). Plaintiff and the Class Members are entitled, pursuant to 18 U.S.C. § 1964(c), to recover threefold their actual damages, attorneys' fees, and costs.

## XI. PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Nationwide Class, respectfully requests that the Court enter judgment in Plaintiff's favor and in favor of the Class for the following relief:

a. an order certifying this case to proceed as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), or in the alternative certifying one or more issues for class-wide treatment under Rule 23(c)(4); designating Plaintiff as Class Representative; and designating undersigned counsel as Class Counsel;

b. actual damages in an amount to be proven at trial, together with prejudgment and postjudgment interest;

c. treble damages pursuant to 18 U.S.C. § 1964(c);

d. a declaration that Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968;

e. permanent injunctive relief enjoining Defendants from continuing the conduct alleged in this Complaint, including the continued operation of the standardized inducement architecture, the standardized extraction architecture, the standardized concealment architecture, and the suppression architecture, and requiring Defendants to disclose to homeowners the corporate-level extraction architecture embedded in the Enterprise's standardized contracts;

f. an order requiring Defendants to disgorge all Scheme proceeds and imposing a constructive trust over Defendants' holdings derived from the Scheme;

g. attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c); and

h. such other and further relief, at law or in equity, to which Plaintiff and the Class may be justly entitled.

## XII. DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims and issues so triable.

DATED: May 29, 2026

Respectfully submitted,

*/s/ Samuel E. Joyner*
Samuel E. Joyner (Texas 24036865)
Forrest Colby Roberts (Texas 24102419)
Kaitlyn Q. McCall (Texas 24131013)
**FBT GIBBONS LLP**
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545-3474
Facsimile: (214) 545-3473
sjoyner@fbtgibbons.com
croberts@bftgibbons.com
kmccall@fbtgibbons.com

*Attorneys for Plaintiff Jeffrey E. Kowitz and the Proposed Class*

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Civil Procedure 5, I hereby certify that on May 29, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record registered with the Court's CM/ECF system.

*/s/ Samuel E. Joyner*
Samuel E. Joyner